V. C. Bratton v. Commissioner.
Bratton v. Commissioner
Docket No. 20929.
United States Tax Court
1951 Tax Ct. Memo LEXIS 330; 10 T.C.M. (CCH) 128; T.C.M. (RIA) 51038; February 2, 1951
*330 Roger S. Randolph, Esq., for the petitioner. John P. Higgins, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: The petitioner in this case seeks a redetermination of deficiencies asserted by the respondent in his deficiency notice as follows: Income and victory tax for 1943
$ 5,339.30
Income tax for 1944
28,433.56
Income tax for 1945
18,435.48 The only question remaining for our determination is whether a valid partnership (for Federal income tax purposes) existed between petitioner and his wife during the years 1943, 1944 and 1945. Findings of Fact The petitioner is an individual who resides in Norman, Oklahoma, and filed his income tax returns for the years in question with the collector of internal revenue for the district of Oklahoma. Petitioner and Doris Bratton were married in 1935. Both petitioner and his wife were graduates of Oklahoma A. & M. College. Doris Bratton had taught school one semester before her marriage. After finishing college in 1932, petitioner worked for various dairy concerns including the Fairmont Creamery Co. of Guthrie, Oklahoma, for whom he went to work in 1936. As sales *331 manager of Fairmont Creamery petitioner traveled throughout the state of Oklahoma. Doris Bratton frequently accompanied petitioner on these trips. Petitioner learned of the possibility of acquiring McCormick's Gilt Edge Dairy of Norman, Oklahoma, late in 1940. Shortly after petitioner's first discussion with Viola L. McCormick, owner of the dairy, she (Viola L. McCormick) attended a Woman's Missionary Society meeting in Guthrie where Doris Bratton arranged to meet her, talked with her and attempted to sell her on petitioner's and Doris Bratton's abilities. Petitioner negotiated for the purchase of the dairy with Viola L. McCormick and her attorney during the first part of 1941. Petitioner and his wife approached A. P. Swearingen of Guthrie, Oklahoma, for a loan. Under date of April 12, 1941, petitioner and his wife signed a demand note for $10,000 payable to A. P. Swearingen. The money borrowed was in the form of a cashier's check and "went into escrow" with Viola L. McCormick's attorney. In 1941 Doris Bratton's mother was approximately 50 years of age, had three adult children, and was worth "in liquid assets" approximately $18,000 to $20,000. She was a close friend of Swearingen's *332 wife, and his good friend. Swearingen required Doris' signature on the note on the assumption that if something happened to petitioner that there would be quite a bit of money behind Doris, plus the fact that Doris is an able woman. The Brattons did not wish Mrs. Farmer (the mother of Doris Bratton) to sign the note, and she did not offer to do so. The note has never been paid. Swearingen has never demanded payment. He collects the interest each year. A corporation with the name of McCormick's Gilt Edge Dairy (hereinafter sometimes referred to as the corporation) was organized under Oklahoma law on April 11, 1941. The authorized capital stock of the corporation was divided into 350 shares of common stock and 100 shares of preferred stock, both at $100 a share. The $10,000 borrowed from A. P. Swearingen was turned into this corporation in exchange for 100 shares of common stock. The common stock [1] was issued of record as follows: Petitioner, 98 shares; Doris Bratton, one share; A. P. Swearingen, one share; Viola L. McCormick, 150 shares. Petitioner acquired the 150 shares of common stock from Viola L. McCormick and paid for it with his promissory note for $15,000, which was secured *333 by pledge of the 250 shares of common stock. Doris Bratton did not sign the note to Viola L. McCormick. The corporation acquired the dairy from Viola L. McCormick by a bill of sale and warranty deed, both of which were dated May 15, 1941. On November 30, 1942, the records of the corporation showed the stock ownership as follows: Common Stock: V. C. Bratton (petitioner)
248 shares
Doris Bratton
1 share
A. P. Swearingen
1 share
Preferred Stock: C. E. Ash *
100 shares
Doris Bratton obtained the Chi Omega sorority account for the business while it was operating as a corporation. Under date of November 30, 1942, V. C. Bratton and his wife, Doris Bratton, C. E. Ash and his wife, Dorothy Ash, signed an instrument entitled "PARTNERSHIP AGREEMENT." The instrument stated that the parties were desirous of forming a partnership in the name of "McCormick's Gilt Edge Dairy" (sometimes hereinafter referred to as the partnership); that V. C. Bratton and C. E. Ash were jointly charged *334 with management and operation of the business and that each should $250receive per month salary; that profit and losses should be shared (after payment of managing partners' salaries) as follows: V. C. Bratton, 5/14ths; Doris Bratton, 5/14ths; C. E. Ash, 2/14ths; and Dorothy Ash, 2/14ths; and that the managing partners, V. C. Bratton and C. E. Ash, were authorized and directed to lease the necessary facilities and housing and to do any or all other things which were necessary or convenient to be done in the premises to the end that the "Partnership" might commence operation without delay. The instrument also contained the following paragraph: "It is agreed between the parties that V. C. Bratton and C. E. Ash have not at the inception of the co-partnership contributed any capital toward the partnership fund but that Doris Bratton and Dorothy Ash have each contributed the sum of $1,000.00." A check for $1,000 was issued to Doris Bratton on the corporation's bank account under date of November 30, 1942. The amount was entered on the books of the corporation as "Notes Receivable - Trade or Loan." The check was endorsed by Doris Bratton and paid by the bank on January 5, 1943. About *335 April 30, 1950, a charge of $1,000 was made to Doris Bratton's "drawing account, credited back to the liability to the corporation." A corresponding record was made as to Dorothy Ash, for $1,000. No interest was charged to either party. Under date of November 30, 1942, the partnership leased the properties of the corporation. The only signatures appearing on the contract were those of V. C. Bratton and C. E. Ash. The instrument recited that they were acting on behalf of themselves, Doris Bratton and Dorothy Ash. A certificate of fictitious name was published January 7, 14, 21 and 28, 1943, showing the four individuals above named as partners of McCormick's Gilt Edge Dairy. Partnership returns were filed with the collector of internal revenue of Oklahoma, for the years here in question, claiming the four individuals above named as partners. Form W-1 (Return of Income Tax Withheld on Wages) was filed for the quarter ending March 31, 1944, which carried the names of the four individuals above mentioned as partners of the partnership. Doris Bratton worked some at night with petitioner, writing letters and checking route records. Doris Bratton did extensive entertaining of customers *336 and prospective customers, in petitioner's home. She and petitioner entertained Commander Ford and his family upon their arrival in Norman and helped them find a house in which to live. Commander Ford was a procurement officer for the Navy. They also entertained Lieutenant Span, officer in charge of Ships Service, upon his arrival in Norman, and she had his fiancee from Santa Monica, California, as a house guest for a week or two, during which time they entertained him nearly every night at home or elsewhere. They also often entertained at their home the medical officer whose approval determined whether or not the dairy products passed the Navy specifications. Doris Bratton invited Mrs. Lomac (manager of the Student Union) over for dinner. A short time later, petitioner called on Mrs. Lomac and she told him they were ready to start buying ice cream from the Gilt Edge Dairy. The partnership obtained raw milk primarily from farmers. The petitioner was primarily responsible for keeping the milk coming in to the dairy. Doris Bratton talked to farmers' wives while he was talking with their husbands, and petitioner and his wife entertained some farmers in their home, and elsewhere. The *337 ice cream and milk business of the Ships Service Stores of the U.S. Navy in Norman was solicited by competitors of the partnership. Most of the solicitation for the Ships Service business was done on a semi-social plane in the home of petitioner and his wife. Doris Bratton visited the Ships Service offices frequently and "most of the time she saw the department head, Lieutenant Span." The partnership obtained the Ships Service business. In November, 1943, the partnership purchased a farm and in connection with the transaction the four individuals, signers of the partnership agreement, signed the note and mortgage, which was executed for an amount of $40,000. Doris Bratton had power to sign checks on the partnership bank account. Petitioner and his wife withdrew a portion of the partnership profits which were deposited in a joint bank account. Doris Bratton signed checks on the joint checking account primarily to pay her income tax. She also signed checks to pay premiums on insurance policies owned by her on petitioner's life, also a check for a down payment on a house and lot in Norman. The partnership books show the following in regard to the "Capital Investment Accounts" of *338 petitioner and his wife: V. C. Bratton
Doris Bratton
12- 1-42
Original Investment
$ 3,498.50
$ 1,000.00
4-30-43
Profit Distribution
11,677.26
11,677.26
Total
$ 15,175.76
$ 12,677.26
Less Drawings
3,065.00
Balance 4-30-43
$ 12,110.76
$ 12,677.26
4-30-44
Profit Distribution
34,715.35
34,715.35
Total
$ 46,826.11
$ 47,392.61
Less Drawings
7,550.06
5,000.00
Balance 4-30-44
$ 39,276.05
$ 42,392.61
4-30-45
Profit Distribution
35,018.53
35,018.53
Total
$ 74,294.58
$ 77,411.14
Less Drawings
23,200.00
19,400.00
Balance 4-30-45
$ 51,094.58
$ 58,011.14
4-30-46
Profit Distribution
49,166.52
49,166.51
Total
$100,261.10
$107,177.65
Less Drawings
67,500.00
50,500.00
Balance 4-30-46
$ 32,761.10
$ 56,677.65
The partnership was terminated on April 30, 1946, at which time the business began to be operated by the corporation. Later the name of the corporation was changed to the Gilt Edge Dairy. A protest dated April 5, 1948, signed by V. C. Bratton, petitioner herein, filed with the internal revenue agent in charge, Oklahoma City, April 12, 1948, contains, among other information, the following *339 language: "It should be remembered that both Dorothy Ash and Doris Bratton had devoted their time to the business since its acquisition 'without salary'. Up to the date the partnership operations commenced, the respective husbands and wives were content that their interests should be merged. "What difference did it make? What they had was theirs and they were satisfied that it should be that way. What they owned was tied up in the Corporation and they were faced with heavy obligations. The first time that a division of the interests of the respective parties became important was when the partnership took over the active operations of the business and a showing beyond the mere execution of the Articles of Co-Partnership became important. "The funds referred to in the Examining Agent's report could have been withdrawn as 'salary' but this would have been tanamount [tantamount] to placing a 'value' upon their services and some 'Revenue Agent' at some future date would undoubtedly have attempted to so interpret such action. The alternative was a 'loan' which was duly and properly made. The funds obtained were placed in the partnership and the notes given were subsequently paid. *340 The Articles of Co-Partnership and evidence of compliance with the 'Assumed Name Law', which was duly filed in the office of the County Clerk, as by law provided, is submitted at Exhibit G. "The record of the payment of the $1,000.00 contributions of Doris Bratton and Dorothy Ash to the partnership fund has served its purpose in that it has caused the Examining Agent to write into his report a lengthy dissertation establishing the intent of the parties to create a co-partnership and the record which was made by the Examining Agent cannot now be withdrawn." Petitioner's wife, Doris Bratton, was not a bona fide partner (for income tax purposes) in the business operated under the name of McCormick's Gilt Edge Dairy, a co-partnership, during the taxable years here in question. Opinion The only question for our determination in this case is whether a partnership, valid for Federal income tax purposes, existed between petitioner and his wife, Doris Bratton, in 1943, 1944 and 1945. Petitioner contends that a valid partnership was formed between himself and his wife and another married couple not here involved. Respondent argues that all the net income of McCormick's Gilt Edge Dairy *341 attributable to the Brattons was includible in petitioner's income. In determining whether a bona fide partnership existed between petitioner and his wife during the years in question, the basic question is, as the Supreme Court stated in : "* * * whether, considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * *" We have so considered the evidence to ascertain intent. A partnership agreement was signed and certain other formal steps were taken; but such acts in and of themselves do not establish a bona fide partnership. Such elements appear in cases where the courts have held that the results of transactions entered into between husband and wife were mere paper reallocation of income *342 among family members. See ; ; and , all cited in Petitioner contends that Doris Bratton contributed $1,000 of capital to the partnership but neither his argument entitled "The legal approach" nor "The economic approach" convinces us that she actually contributed any capital to the new business entity. It is evident that the new business entity followed in the footsteps of the corporation without any change in its operation. From the testimony of the petitioner and the banker (called as a witness) we conclude that the new arrangement was a continuation of the old business. There is no indication that any of the assets (cash or otherwise) of the corporation was not available to the new entity. The partnership agreement made special mention of the fact that the managing partners (petitioner and C. E. Ash) were authorized to lease the necessary facilities, etc., to the end that the partnership might commence operation without delay, but such an act appears unimportant for petitioner as a managing *343 partner of the partnership would be dealing with himself as president and majority stockholder of the corporation. The evidence is conclusive that it was the intention of the directors and officers of the corporation to continue the same business in a different form. The fact that the $1,000 check was issued to Doris Bratton under date of November 30, 1942, and was not paid at the bank until January 5, 1943, indicates to us that the partnership had no pressing need for the money, or that the money was already available to the partnership and the check was drawn to give the transaction the appearance of a loan. We also note that the corporation charged no interest on the alleged loan and in answer to the question: "When was the loan repaid?" the accountant for the corporation testified as follows: "Just from memory, without looking, I believe it was April 30, 1950." This was less than three weeks before trial. Such payment was accomplished by a charge against Doris Bratton's "drawing account, credited back to the liability to the corporation." In the protest the petitioner, under oath, refers to the $1,000 as follows: "The alternative was a 'loan' which was duly and properly made." *344 He goes on to refer to it again as: "The record of the payment of the $1,000 * * * has served its purpose * * *," causing the examining agent to report at length establishing the intent to create a co-partnership "which can not now be withdrawn." With the petitioner putting quotation marks around the word "loan" and referring to the "record of the payment" [italics supplied] as serving its purpose - causing a report, we can not but believe that he did not consider that there was reality in what he can call loan only by using quotations. Certainly the fair connotation of such expression is that there was something only to be called a "loan," but not really such. The making of a book entry disposing of it, only very shortly before trial - even on the indecisive testimony as to date, tends to depreciate the value of the evidence about this "loan". We think it was record rather than loan. Considering all the evidence on this point, we conclude that the $1,000 matter was an attempt to establish, contrary to fact, a contribution of original capital in the partnership by the wife and was only a mere paper transaction containing no substance as far as it concerns this income tax question. *345 Petitioner contends that Doris Bratton performed vital services for the partnership during the years here in question. The partnership agreement provides specifically that petitioner and Ash "are jointly charged with the management and operation of the partnership business"; also refers to them as "managing partners". Petitioner testified that Doris Bratton "had charge, you might say, of public relations". There is no proof in the record that the performance of such services constitutes vital additional services. She accompanied petitioner on trips and did extensive entertaining of customers and prospective customers, generally in the family home. This type of activity may have been what petitioner had in mind when he testified in the above indefinite terms as to her being in charge of public relations. She accompanied him on trips when he was working for Fairmont Creamery Co. long before the creation of the partnership. She also entertained people with whom petitioner was dealing long before the formation of the partnership for she contacted Viola L. McCormick in Guthrie and attempted to sell her on their (petitioner's and Doris Bratton's) abilities. Such activities are not reasonably *346 to be considered as vital additional services to the business; nor do we think they are additional to what she had performed before the alleged formation of the partnership. See . A careful examination of the evidence in this case reveals that primarily Doris Bratton's alleged function was entertainment. Petitioner, on brief, claims that his wife solicited and obtained the Ships Service Stores account, yet at the trial he testified, as to that account, that he solicited some and that "Most of the solicitation was done on a sort of a semi-social plane in our home." Petitioner also contends, on brief, that Doris Bratton assisted in promoting farmer relationships; that she called on house mothers of sororities and fraternities as well as the lady in charge of the Student Union and that she assisted in securing or retaining that account. There is testimony that Doris Bratton talked to farmers' wives while petitioner talked to the husbands but no indication as to what she and the wives talked about. Petitioner and his wife entertained some farmers in their home and at times elsewhere. Doris Bratton obtained the Chi Omega sorority account for the *347 business while it was operating as a corporation. Furthermore, the petitioner actually acquired the Student Union account, for although Doris Bratton invited the manager of the Student Union over for dinner, it was the petitioner that called on her and secured the account. Petitioner also claims, on brief, that Doris Bratton worked at night, writing letters and checking route records. Such services are services "such as any hired employee might well perform." (Dec. 20, 1950). The fact that petitioner and his wife withdrew a portion of the partnership profits which were deposited in a joint bank account does not prove complete control in Doris Bratton over her alleged share of partnership profits, neither do the facts that she signed checks to pay premiums on insurance policies owned by her on petitioner's life and a down payment on a house and lot in Norman. The fact that she signed checks on the joint checking account primarily to pay her income tax is an indication to us that the arrangement was formed primarily for tax purposes. We find in the vague evidence as to the wife's activities no convincing proof of intent *348 to be a partner, or of participation more than as a wife might reasonably assist her husband - and as she did before the partnership. He, under the evidence, actually procured the business. A wife's mere assistance to her husband by entertainment in the home, in the manner indicated here, is not satisfactory proof of reality of partnership. Other incidents tend to contradict the contention of bona fide partnership arrangement. Thus, we find that the partnership agreement, signed under date of November 30, 1942, stated that petitioner contributed no capital at the inception of the partnership, yet the books indicate that his original capital investment was $3,498.50. This reflects upon the reliability of the books. Again we note that though the wife appears as record holder of one share of stock in the corporation, that share (as well as that of Swearingen) was pledged by the petitioner as security for his note to Viola L. McCormick, though Doris Bratton did not sign the note. Her formal ownership of such stock was clearly ignored by him. Likewise, when on November 30, 1942, the corporation leased the dairy property to the partnership, the contract was signed only by petitioner and *349 Ash, the contract reciting that they were acting on behalf of themselves, Doris Bratton and Dorothy Ash. On the basis of all the evidence, and after considering the elements and circumstances set forth above quoted from the Culbertson case, supra, and having observed the demeanor of witnesses and their interest or lack of interest, and upon the basis of all facts presented, but making no objective test, in the inquiry as to intent, we hold that the petitioner and his wife did not in good faith with a business purpose intend to join in the present conduct of a partnership enterprise, and that petitioner's wife was not a bona fide partner in the business operated under the name of McCormick's Gilt Edge Dairy, a co-partnership, during the taxable years here in question, within the meaning of Decision will be entered for the respondent. Footnotes
1. The record is not clear in regard to the additional 100 shares of common stock authorized.↩
*. C. E. Ash was manager of the business when it was owned by Viola L. McCormick.↩